IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JEAN P.,

Plaintiff,

vs.

KILOLO KIJAKAZI, Acting Commissioner of
the Social Security Administration;

Defendant.

**8:21-CV-200**

**MEMORANDUM AND ORDER
REGARDING THE PARTIES' MOTIONS
CONCERNING DENIAL OF SOCIAL
SECURITY BENEFITS**

Plaintiff, Jean P., filed her Complaint, Filing 1, seeking judicial review of Defendant's, the Commissioner of the Social Security Administration's, denial of her application for disability insurance benefits. Jean P. moves this Court for an order directing an award of benefits, or, in the alternative, remanding the Commissioner's final decision for further administrative proceedings. Filing 21. The Commissioner filed a motion to affirm the agency's final decision denying benefits. Filing 24. For the reasons stated below, the Court denies Jean P.'s motion and grants the Commissioner's motion.

## I.  BACKGROUND

Jean P. was fifty-six years old when she applied for disability insurance benefits, Filing 17-6 at 2, and fifty-eight years old at the time of the hearing and corresponding decision at issue, *see* Filing 17-2 at 21; Filing 17-3 at 141. She has a high school diploma, Filing 17-7 at 14, and she primarily worked as a customer service representative from 2004 until 2011 and an interviewer from 2011 to 2018. Filing 17-7 at 15.

### A.  Procedural History

On January 19, 2019, Jean P. filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, alleging a disability-onset date of February

1

1, 2018. Filing 17-2 at 12. The Commissioner denied the claim initially on July 31, 2019, Filing 17-5 at 11, and affirmed the denial on reconsideration in January 2020, Filing 17-5 at 19. On July 13, 2020, a telephonic hearing was held before the administrative law judge (ALJ). Filing 17-3 at 141.

On August 7, 2020, the ALJ issued his decision denying Jean P.'s claim, finding Jean P. was not disabled as defined by sections 216(i) and 223(d) of the Social Security Act between February 1, 2018, and the date of the ALJ's decision. Filing 17-2 at 12-21. The Social Security Appeals Council ("Appeals Council") found no reason to review the ALJ's decision and sent notice of its denial of Jean P.'s request for review on April 6, 2021. Filing 17-2 at 2-4. Jean P. timely filed the present action. Filing 1; *see* 42 U.S.C. § 405(g) (providing one who has been denied benefits "may obtain a review of such decision a civil action commenced within sixty days after the mailing to [plaintiff] of notice of such decision").

### B. Administrative Hearing

The ALJ heard the matter on July 13, 2020. Filing 17-3 at 141. Jean P. testified that she worked as a customer service representative and was mainly responsible for resolving issues with returns, reships, and refunds. Filing 17-3 at 146. She also worked as an interviewer and/or research consultant and would conduct surveys over the phone. Filing 17-3 at 148. She has not worked since February 1, 2018. Filing 17-3 at 145.

Jean P.'s attorney stated Jean P. suffers from both mental and physical impairments. Filing 17-3 at 144. Jean P.'s physical impairments consist mostly of injuries to her left leg and knee, including a tibial fracture, full fracture, and a patellar fracture. Filing 17-3 at 144. Her attorney stated that Jean P. has been diagnosed with arthritis in the left mid-foot and has been provided a cam boot, or hard shoe, because of her arthritis. Filing 17-3 at 144.

In discussing the pain associated with her physical impairments, Jean P. testified that she had been fitted for a knee brace for each leg and was attending physical therapy and chiropractic adjustments three times a week and was scheduled to continue doing so for the 90 days. Filing 17-3 at 152. Jean P.'s main form of exercise was a forty-five-minute walk around the block. Filing 17-3 at 153. She estimated that before her injuries, the walk would only have taken twenty to thirty minutes. Filing 17-3 at 153. She no longer uses a cane and instead wears knee braces when walking; she stated the braces "help[] tremendously," but she was still sore after her walks. Filing 17-3 at 152-53. When sitting, she reclines or lays down to allow her to keep her legs straight out. Filing 17-3 at 153. She also testified her injuries have negatively impacted how she goes up and down stairs. Filing 17-3 at 154. Jean P. further testified she was going to a pain doctor and went from taking four medications a day to two medications a day for pain management. Filing 17-3 at 157.

Jean P. testified that one of the issues preventing her from returning to work was her anxiety. Filing 17-3 at 147. When under normal work stress and pressure and when dealing with difficult customers, Jean P. testified her anxiety would eventually cause her to "uncontrollably cry[]" and that she "could[] [not] bear to . . . cry in front of coworkers." Filing 17-3 at 147–48. Jean P. testified her anxiety is caused by becoming emotionally upset and that she was unable to control it or explain why it happens. Filing 17-3 at 149. She further stated that she struggled fulfilling the memory requirements[1] of her previous position as an interviewer. Filing 17-3 at 149-50. She also testified that she was on a high dosage of anxiety medication that had been helping and had experienced no side effects from the medication. Filing 17-3 at 149.

---

[1] Jean P. was required to type the responses to the open-ended survey questions verbatim and testified she was unable to fulfill this requirement. Filing 17-3 at 149.

Jean P. testified she has bouts of depression that cause her to sleep a lot and render her unable to engage in self-care activities like brushing her teeth. Filing 17-3 at 150. She testified that in 2017, she lost her mother, father, dog, and cat, and had health problems with her other dog. Filing 17-3 at 150. The depressive episodes happened at least one week per month. Filing 17-3 at 151. Jean P. testified she does not experience excessive sleepiness during the day and noted she no longer struggles with insomnia now that she is taking medication for it. Filing 17-3 at 151-52.

When asked about any housework she performs, Jean P. responded that she takes care of the kitchen responsibilities which include shopping, planning and preparing meals, and keeping the kitchen clean. Filing 17-3 at 154. Her son vacuums, and her husband does the laundry and cleans the shower in the bathroom. Filing 17-3 at 154. Jean P. further testified that other than one bathroom and the kitchen, her husband and son do the housecleaning for her. Filing 17-3 at 154. She testified she has no issue with self-care activities such as dressing herself and bathing herself. Filing 17-3 at 155. Jean P. testified her day-to-day activities include reading, walking, kitchen work, cleaning, and walking around the perimeter of her pool to help her knees. Filing 17-3 at 155-56. She also testified she can drive a car and uses her vehicle to run errands and occasionally to visit a park with her dog to watch the geese. Filing 17-3 at 156.

Stella Frank, a vocational expert, testified as to the classification of Jean P.'s previous work and Jean P.'s ability to perform past relevant work during the adjudication of the case before the ALJ. Filing 17-3 at 146, 157-59. She classified Jean P.'s past work[2] as a sedentary position most consistent with the title customer order clerk with a specific vocational preparation rating (SVP) of 4. Filing 17-3 at 146. Ms. Frank testified that a person who can perform sedentary work, that is

---

[2] When asking Ms. Frank about past relevant work, the ALJ only referenced Jean P.'s work as a customer service representative. Jean P.'s attorney agreed with the ALJ and Ms. Frank that classifying Jean P.'s past relevant work as a customer order clerk was accurate. Filing 17-3 at 154.

one who can stoop, kneel, crouch, and crawl occasionally; can perform work that does not require sustained exposure to concentrated, extreme temperatures or vibration; and can perform work that does not require the operation of foot controls, would be able to perform work as a customer order clerk. Filing 17-3 at 158. She testified that a person who can "understand, remember, and persist at a consistent pace while performing tasks that are simple, straightforward, and uncomplicated [and] . . . can exercise proper judgment in performing those tasks and is able to respond appropriately to at least routine changes in the workplace and routine supervision" would not be able to perform work at the SVP: 4 level. Filing 17-3 at 158-59. Ms. Frank further testified that for unskilled and semiskilled work, one workday missed per month is usually tolerated by employers, but any rate that exceeds that is generally not tolerated. Filing 17-3 at 159.

### C. Additional Medical and Other Evidence

Jean P.'s initial disability report alleges the following conditions limit her ability to work: type 2 diabetes, osteoporosis, osteoarthritis, depression, anxiety, IBS, high cholesterol, Barrett's esophagus, and the use of a cane. Filing 17-7 at 13. After her initial filing, Jean P. reported a change in condition two times. Filing 17-7 at 43; Filing 17-7 at 56. First, on August 20, 2019, Jean P. reported that she was consistently in pain, even with medication, and that her pain was at seven out of ten every day. Filing 17-7 at 43. Second, on February 19, 2020, Jean P. reported her left knee was always in pain. Filing 17-7 at 56.

#### 1. Physical Impairments

Medical records dated May 20, 2018, indicate Jean P. suffered a lateral tibial plateau fracture and was placed in a knee immobilizer with crutches. Filing 18-1 at 85. At a follow up appointment on August 16, 2018, Jean P.'s treating physician, Dr. Hsueh-Yu Wesley Cheng, M.D., noted her fracture was healing well and that she could begin weight bearing as tolerated. Filing

18-1 at 119. Additionally, Dr. Cheng found Jean P. had significant osteoarthritis and osteopenia in her left foot and placed her in a walking boot. Filing 18-1 at 118. On June 21, 2018, Jean P. reported she had an additional injury from falling and increased pain. Filing 18-1 at 117. Dr. Cheng found the previous tibial plateau fracture appeared slightly displaced compared to prior imaging. Filing 18-1 at 117. Jean P. was instructed to continue with brace immobilization and non-weightbearing status and to begin physical therapy. Filing 18-1 at 117. By July 19, 2018, Jean P. reported her knee was doing well, she had begun physical therapy, and her pain was improving. Filing 18-1 at 114. On August 30, 2018, after sustaining another fall and fracturing her patella, Dr. Cheng recommended Jean P. continue the use of a left knee brace for immobilization. Filing 18-1 at 115-16.

On October 8, 2018, Jean P. saw Dr. Shane A. Schutt, M.D., for persistent pain in her left foot and an inability to put weight on it. Filing 18-1 at 109. Dr. Schutt found osteopenia and osteoarthritis in the left foot and recommended Jean P. continue to use her boot. Filing 18-1 at 110. On November 19, 2018, Jean P. reported her knee felt better and imaging showed a healed tibial plateau fracture and a healing patella fracture. Filing 18-1 at 108. At that time, Dr. Cheng indicated Jean P. could continue weight bearing as tolerated and could discontinue the use of a brace. Filing 18-1 at 108.

Dr. Fredrick Schwartz, M.D., is Jean P.'s primary care physician. Jean P.'s records from Dr. Schwartz show that in June, August, and October of 2018, Jean P. reported the presence of lower back pain, knee pain, and pain as a result of the osteoarthritis. Filing 18-2 at 12, 16-17, 25. In January and June of 2019, Jean P. reported lower back pain and pain from osteoarthritis. Filing 18-2 at 25, 77. At the end of June 2019, Jean P. was sent for a consultative examination and reported osteoarthritis in the knees, ankles, and feet; osteopenia; and back pain that began in 1998.

6

Filing 18-2 at 90-91. Jean P. reported the back pain radiates into her ankles and feet and the pain worsens when walking and standing. Filing 18-2 at 91. She rated her pain as a nine on a scale of one-to-ten. Filing 18-2 at 91. However, she indicated pain medication provides some relief. Filing 18-3 at 91.

Dr. Christopher M. Criscuolo, M.D., treats Jean P. for chronic pain. Filing 18-2 at 103. Dr. Criscuolo's records indicate Jean P. has taken hydrocodone four times a day for several years to manage pain. Filing 18-2 at 103. By September 2019, Jean P. was taking Percocet three times a day for pain. Filing 18-3 at 20. Jean P. reported her pain symptoms were stable and the medication was effective at maintaining a pain level of five out of ten. Filing 18-3 at 20. In November 2019, January 2020, and March 2020, Jean P. reported her pain symptoms were stable and manageable. Filing 18-3 at 25, 55, 60.

## 2. Mental Impairments

On December 16, 2017, Jean P. reported feeling increased sadness and a lack of interest in socializing. Filing 18-2 at 7. Dr. Schwartz referred her to Dr. Michael Sedlacek, M.D., for a psychiatric consultation. Filing 18-2 at 11. On March 8, 2018, Jean P. reported to Dr. Sedlacek that she was experiencing depression, anxiety symptoms, and worsening insomnia. Filing 18-1 at 18. Jean P. reported her symptoms were exacerbated by chronic back pain, headaches, work, and impaired sleep and stated her symptoms were causing her significant distress and impairment in day-to-day functioning. Filing 18-1 at 18. Dr. Sedlacek diagnosed Jean P. with major depressive disorder, unspecified anxiety disorder, and insomnia. Filing 18-1 at 22. Dr. Sedlacek prescribed Cymbalta for her symptoms. Filing 18-1 at 23.

On March 29, 2018, Jean P. reported she was doing well overall, but felt her symptoms had slightly worsened, though they were not causing a significant impairment in daily functioning.

Filing 18-1 at 14. On May 14, 2018, she reported her symptoms were improved and were not causing significant impairment in her daily functioning. Filing 18-1 at 10. On July 3, 2018, however, Jean P. reported her symptoms were no different but were causing significant impairment in daily functioning. Filing 18-1 at 6. On October 31, 2018, Jean P. reported her symptoms were slightly worse and continued causing significant impairment in daily functioning. Filing 18-1 at 2.

On April 23, 2019, Jean P. reported she was very easily stressed and had poor stress tolerance, her symptoms were no different, and her symptoms were causing significant impairment in daily functioning. Filing 18-2 at 59. On July 29, 2019, Jean P. reported her symptoms were slightly improved but still causing significant impairment in daily functioning. Filing 18-2 at 115. On October 1, 2019, Jean P. reported her symptoms were no different and were continuing to cause significant impairment in daily functioning. Filing 18-2 at 133. On January 14, 2020, Jean P. reported her symptoms were slightly improved and were no longer causing significant impairments in daily functioning. Filing 18-3 at 38.

### D.  The ALJ's Findings

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See* 20 C.F.R. § 404.1520(a).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), (b). The ALJ found Jean P. had not engaged in substantial activity since her alleged onset date of February 1, 2018. Filing 17-2 at 14.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to perform "basic work activities," 20 C.F.R. §§ 404.1520(a)(4)(ii) & (c), and satisfies the "duration requirement." 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522. If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). The ALJ determined Jean P. had the following severe impairments: osteoarthritis in multiple joints and degenerative disc disease of the lumbar spine. Filing 17-2 at 14.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of recognized impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. § 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed

impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ determined Jean P. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Filing 17-2 at 16.

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC) to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (e), (f). "Past relevant work" refers to work performed by the claimant within the last fifteen years or the fifteen years prior to the date that the disability was established. *See* 20 C.F.R. § 404.1565(a) and 416.965(a). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). Jean P.'s past relevant work is classified as sedentary work. Filing 17-2 at 21. The ALJ determined Jean P. had RFC such that she could "perform sedentary work as defined in 20 CFR 404.1567(a) except: she can occasionally stoop, kneel crouch, and crawl; she can perform work that does not require sustained exposure to concentrated extreme temperatures or vibration; and she is able to perform work that does not require the use of foot controls." Filing 17-2 at 17. As a result, the ALJ agreed with the vocational expert and determined Jean P. could perform past relevant work as a customer order clerk. Filing 17-2 at 20-21. Accordingly, the ALJ found Jean P. was "not disabled under sections 216(i) and 223(d) of the Social Security Act." Filing 17-2 at 21.

## II.  DISCUSSION

### A.  Standard of Review

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d

10

611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both supports and detracts from the ALJ's decision and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). The Court should not reverse merely because the Court would have decided differently. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). The Eighth Circuit has held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).

Additionally, the Court must determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (internal citations omitted) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

### B. Analysis

Jean P. asserts three errors: (1) the ALJ failed to account for Jean P.'s mental functional limitations in his RFC finding and hypothetical question to the vocational expert; (2) the ALJ failed to account for Jean P.'s need to use knee braces; and (3) the ALJ and Appeals Council

unconstitutionally derived their power to adjudicate Jean P.'s claim from the Commissioner of Social Security because the Commissioner's removal statute, and thus the structure of the Social Security Administration, violates separation of powers. Filing 22 at 1. As discussed below, the Court finds the ALJ did not err and the ALJ and Appeals Council had the authority to decide Jean P.'s case.

   1.   *Omission of Jean P.'s Mental Limitations from the RFC Analysis and Hypothetical Question to the Vocational Expert*

Jean P. argues the ALJ found she had mild limitations in three functional areas after completing the psychiatric review technique (PRT) but contrary to this finding, failed to account for those mild limitations in his calculation of the RFC and hypothetical question to the vocational expert. Filing 22 at 3, 5–6. Jean P. asserts the ALJ's omission of the mental limitations from the analysis is legal error that requires reversal. Filing 22 at 5–6. The Commissioner asserts the ALJ's determination that Jean P. had "no more than mild," and thus no severe, mental limitations and his inclusion of no mental limitations in the RFC finding are in harmony, especially given the ALJ's consideration of the evidence and record when completing the PRT analysis. Filing 25 at 7. Therefore, the Commissioner argues the ALJ did not err, and his findings should be affirmed. Filing 25 at 10. The Court agrees with the Commissioner.

   a.   ALJ's RFC Analysis

Jean P. asserts the ALJ erred by failing to include Jean P.'s mild limitations in three functional areas in his RFC assessment. Filing 22 at 4, n.1. According to Jean P., to have properly considered her mild mental limitations in the RFC assessment, the ALJ needed to expressly state in his written opinion what role the mental limitations played in the analysis. *See* Filing 22 at 5 ("[T]he ALJ here included precisely zero mental functional limitations in the RFC finding . . .

[t]hus, the ALJ's RFC finding . . . [was] defective because [it] failed to in any way account for Plaintiff's admitted mental functional limitations.") (emphasis omitted). Jean P. relies on Social Security Ruling 85-15, which states, "any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment," and Social Security Ruling 83-10, which defines the RFC as "a medical assessment of what an individual can do in a work setting in spite of the functional limitations . . . imposed by all of . . . her medically determinable impairments." Filing 22 at 2; SSR 85-15, 1985 WL 56857 at *6 (Jan. 1, 1983); SSR 83-10, 1983 WL 31251 at *2 (Jan. 1, 1985).

To assess a claimant's mental impairments, the ALJ is required to use the PRT at step two of the sequential analysis. 20 C.F.R. § 404.1520a. When using the PRT, the ALJ must first determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If there is a medically determinable mental impairment, then the ALJ must "rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R. § 404.1520a(b)(2). The ALJ will rate the degree of a claimant's functional limitation in four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(2)-(3). When rating the degree of limitation in the four functional areas, an ALJ uses the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). If the ALJ assigns a rate of "extreme," that degree of limitation is "incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c)(4). However, if the ALJ rates the degree of limitation as "none" or "mild," the ALJ will generally conclude the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1).

Using the PRT, the ALJ found Jean P. had mild limitations in three functional areas. Filing 17-2 at 15-16. The first functional area is understanding, remembering, or applying information.

20 C.F.R. § 404.1520a(c)(3). The ALJ noted that while Jean P. alleged "her impairments affect her memory and ability to understand and follow instruction . . . she admits the ability to prepare meals, manage her own money . . . [and] is noted to have intact memory and normal insight and judgment." Filing 17-2 at 15. As a result, the ALJ found Jean P. had "no more than mild limitation in this area of functioning." Filing 17-2 at 15. The second functional area is interacting with others. 20 C.F.R. § 404.1520a(c)(3). Because Jean P. "did not allege the presence of limitation in this area" and was "able to spend time with others in person and over the phone . . . [and] is noted to have good eye contact and a pleasant demeanor," the ALJ found Jean P. had no limitation in this area of functioning. Filing 17-2 at 15.

The third functional area is concentrating, persisting, and maintaining pace. 20 C.F.R. § 404.1520a(c)(3). The ALJ stated that while Jean P. "alleged that her impairments affect her ability to concentrate and complete tasks . . . she admitted that she is able to pay attention for the length of a movie and read . . . [and] is generally noted to have good concentration." Filing 17-2 at 15. As a result, the ALJ found Jean P. had "no more than mild limitation in this area of functioning." Filing 17-2 at 15. The fourth functional area is adapting or managing oneself. 20 C.F.R. § 404.1520a(c)(3). Jean P. alleged she has difficulty adapting to changes, dealing with stress, controlling her emotions, is easily overwhelmed, and that "her mental impairments are exacerbated by her physical complaints." Filing 17-2 at 16. The ALJ noted that Jean P. has been "observed to have depressed or anxious mood, a flat affect, and tearfulness, but more often demonstrates a normal mood and affect, cooperative behavior, and good grooming." Filing 17-2 at 16. As a result, the ALJ found Jean P. had no "more than mild limitation in this area of functioning." Filing 17-2 at 16.

14

While the ALJ found mild limitations in three functional areas, there were only two references to mental functioning or mental capacity in the ALJ's RFC analysis. Filing 17-2 at 18–20. The ALJ stated Jean P.'s ability to engage in ordinary life activities is an indication she has the "capacity to perform the requisite physical and mental tasks that are part of everyday basic work activity." Filing 17-2 at 18. Additionally, the ALJ stated Jean P.'s "impairments do not affect her mental functioning . . . to the extent she would require limitation in her exposure to hazards." Filing 17-2 at 19-20. Neither discussion of Jean P.'s mental capacity or functioning specifically referenced the mild mental limitations the ALJ found in the PRT analysis. The question is whether the ALJ is required to expressly state his consideration of a claimant's functional limitations in the RFC assessment in order for the limitations to be "reflected" in the RFC assessment. *See* SSR 85-15, 1985 WL 56857 (stating that "any impairment-related limitations . . . must be reflected in the RFC assessment"). For the reasons explained herein, the Court finds an ALJ is not required to include an express statement regarding the functional limitation in the RFC assessment to have been properly considered.

Each step in the disability determination serves a distinct purpose, entails a separate analysis and legal standard, and requires a different degree of precision. *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 883 n.3 (8th Cir. 2006)) (stating that, as a general proposition, the assertion that "the [PRT] . . . must be consistent with the ALJ's Residual Functional Capacity determinations" is "unobjectionable and correct," but "[a]s a practical matter . . . the different steps serve distinct purposes [and] the degrees of precision required at each step differ . . . "). While the ALJ is required to consider all limitations in the RFC assessment, the ALJ is not required to expressly state the functional limitations found

15

in the RFC assessment.[3] *See Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008) (quoting *Hepp v. Astrue*, 511 F. 3d 798, 806 (8th Cir. 2006)) ("We have held that an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."); *William G. Long JR., v. Comm'r of Soc. Sec.*, No. CV 20-1358-MN, 2022 WL 609620 at *7 (D. Del. Jan. 31, 2022) (citing *Smith v. Comm'r of Soc. Sec.*, 2016 WL 3912850 at *9 (D.N.J. July 19, 2016)) ("Although an ALJ must consider limitations imposed by all of an individual's impairments, both severe and non-severe, when making their RFC assessment, there is no requirement that an ALJ must find or include limitations associated with mild impairments."); *Brumfield v. Saul*, No. CV 19-4555, 2020 WL 4934315 at *6 (E.D. Pa. Aug. 21, 2020) ("The ALJ emphasized that while the analyses differed, the RFC assessment completed at step four ultimately reflects the degree of limitation I have found in the paragraph B mental functional analysis. That RFC assessment understandably contained no work-related limitations based on [petitioner's] nonsevere mental health impairments. Such a finding is consistent with the substance of the analysis done at step two.") (internal citations omitted). Additionally, the Court's "deferential standard of review precludes [the Court] from labeling findings as inconsistent if they can be harmonized." *Chismarich*, 888 F.3d at 980.

The ALJ's PRT conclusions were based on his consideration of the entire record, which indicated that Jean P. often demonstrated she had a normal mood and affect, cooperative behavior, and good grooming. Filing 17-2 at 16. The ALJ considered that Jean P. was able to spend time with others in person and over the phone, prepare meals, manage her own money, and that she had

---

[3] *But see Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) ("Perhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity . . . [B]ecause the ALJ here gave no explanation, a remand is in order."); *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 210 (3d Cir. 2019) ("[T]he functional limitation findings do not dictate the terms of the ALJ's statement of the claimant's limitation in the final analytical steps. But those findings are relevant to that statement of the limitation, which must be sufficient to reflect all of a claimant's impairments.").

intact memory and normal insight and judgment. Filing 17-2 at 15. Finally, the ALJ considered that the record "reflect[s] minimal treatment for her mental impairments" and that the record showed "overwhelmingly normal mental status findings throughout the period of adjudication." Filing 17-2 at 16; *See generally* Filing 18-1; Filing 18-2; Filing 18-3. "These considerations confirm the ALJ had sound knowledge of the entire record and understood the impact of [Jean P.'s] mental impairments before determining [Jean P.'s] RFC." *See William G. Long JR.*, 2022 WL 609620 at *7. The ALJ found Jean P.'s mental impairments were mild, and therefore, non-severe. Filing 17-2 at 15–16; *see also* 20 C.F.R. § 404.1520a(d)(1). The "RFC assessment understandably contained no work-related limitations based on [Jean P.'s] nonsevere mental health impairments." *See Brumfield*, 2020 WL 4934315 at *6. "Such a finding is consistent with the substance of the analysis done at step two." *Id.* Accordingly, this Court finds the ALJ's determinations at steps two and four are in harmony and, therefore, the ALJ did not err. *See Chismarich*, 888 F.3d at 980 ("[O]ur deferential standard of review precludes us from labeling findings as inconsistent if they can be harmonized.").

Even if the ALJ's consideration of the mild functional limitations in step four was incomplete, any error is harmless. *See Alvey v. Colvin*, 536 F. App'x 792, 793-95 (10th Cir. 2013) (finding that the failure to include a discussion of any mental limitations in the RFC was harmless error because there was "no substantial evidence that would allow a reasonable administrative factfinder to include any mental limitations in [the] RFC"); *Brumfield*, 2020 WL 4934315 at *8 (holding that any error by the ALJ was harmless because there was little evidence to support a determination that the claimant's mental limitations would result in work-related limitations). Based on the record, there is little evidence to support the claim that Jean P.'s mental impairments, when considered alone or in combination with her physical impairments, would result in work-

related limitations. *See Brumfield*, 2020 WL 4934315 at *8; Filing 17-2 at 16; *See generally* Filing 18-1; Filing 18-2; Filing 18-3. While Jean P. suffers from depression and anxiety, the record indicates her symptoms have been mild during the relevant period. *See* Filing 18-1 at 2, 6, 10, 14; Filing 18-2 at 59, 115, 133; Filing 18-3 at 38. Because there is little evidence to indicate Jean P.'s mental impairments would result in work-related limitations, any deficiency in the ALJ's opinion-writing technique regarding his discussion of the mental limitations had no bearing on the outcome. *See Owen*, 551 F.3d at 801 ("We have held that an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." (quoting *Hepp*, 511 F.3d at 806)). Further, Jean P. has not presented evidence demonstrating that her mental limitations cause work-related limitations. *See Brumfield*, 2020 WL 4934315 at *8; *see also* Filing 22 at 2-7. Accordingly, any error by the ALJ would be harmless.

      b.  ALJ's Hypothetical Question to the Vocational Expert

Jean P. additionally argues the ALJ failed to account for her mild functional limitations in his hypothetical question to the vocational expert, constituting reversible error. Filing 22 at 5. During the telephonic hearing, the ALJ indicated to the vocational expert he was referencing an individual who had past work as customer order clerk and asked,

> I want to add another factor to what I've given you . . . I want you to assume this person is able to understand, remember, and persist at a consistent pace while performing tasks that are simple, straight forward, and uncomplicated. This person can exercise proper judgment in performing those tasks and can respond appropriately to at least routine changes in the workplace and to routine supervision. You indicated that the past work was classified at the SVP: 4 level. Given the abilities that I just now set out, could that person perform work at the SVP: 4 level?

Filing 17-3 at 158-59. The vocational expert responded that such a person could not perform work at the SVP: 4 level. Filing 17-3 at 159.

"In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole. *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006). A hypothetical question posed to a vocational expert is proper if it sufficiently sets out all the impairments accepted by the ALJ as true. *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1495-96 (8th Cir. 1994)) ("The ALJ's hypothetical question properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit."). "Likewise . . . an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that [the] 'impairments significantly restricted [the] ability to perform gainful employment.'" *Owen*, 551 F.3d at 802 (quoting *Eurom v. Chater*, 56 F.3d 68 (8th Cir. 1995)).

The ALJ found Jean P. had mild limitations in three functional areas: understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Filing 17-3 at 14–15. Given the limitations were only mild, the statement to the vocational expert that the "person is able to understand, remember, and persist at a consistent pace . . . can exercise proper judgment . . . and can respond appropriately to routine changes . . ." properly encompasses the non-severe limitations the ALJ found.

Even if the hypothetical question posed by the ALJ did not adequately convey the mild limitations, the ALJ is permitted to "omit alleged impairments from a hypothetical question" when the record does not indicate that those "impairments significantly restricted [the] ability to perform gainful employment." *See Owen*, 551 F.3d at 802 (quoting *Eurom*, 56 F.3d 68). There is substantial evidence in the record showing that while Jean P. may have mild limitations in some functional areas, she more often presents with full orientation; intact memory; normal insight and

19

judgment; good eye contact; a pleasant demeanor; cooperative behavior; and normal speech, thought processes, associations, and cognition. *See generally* Filing 18-1; Filing 18-2; Filing 18-3. The record indicates that Jean P.'s mild limitations would not significantly restrict her ability to perform gainful employment. *See Owen*, 551 F.3d at 802 (quoting *Eurom*, 56 F.3d 68). As a result, the ALJ is permitted to omit the impairments from the hypothetical question. *Id.* Accordingly, the ALJ's hypothetical question to the vocational expert was not improper.

### 2.   *Failure to Account for Jean P.'s Use of Knee Braces*

Jean P. next argues the ALJ's RFC finding and hypothetical question did not account for Jean P.'s "proven need to use leg braces" because the ALJ "erroneously believed the Plaintiff had stopped using leg braces in November of 2018" and therefore, "remand is required." Filing 22 at 7–8. The Commissioner asserts the ALJ did not erroneously believe Jean P. had stopped using braces in 2018 and that Jean P. has failed to meet the burden of showing what additional RFC limitations "were warranted based on her use of knee braces." Filing 25 at 12. The Court agrees with Commissioner.

 The ALJ determined Jean P. was able to "perform sedentary work . . . except: she can occasionally stoop, kneel, crouch, and crawl; she can perform work that does not require sustained exposure to concentrated extreme temperatures or vibration; and she is able to perform work that does not require the use of foot controls." Filing 17-2 at 17. When making this determination, the ALJ considered Jean P.'s tibial plateau fracture, the presence of osteoarthritis in her lower extremities, osteopenia, and the presence of degenerative disc disease of the lumbar spine. Filing 17-2 at 18–19. The ALJ noted that at times, Jean P. was maintaining a non-weight bearing status, but by "mid-November 2018 . . . she was weightbearing as tolerated at that that time and was instructed to discontinue use of the brace." Filing 17-2 at 18 (citing Filing 18-1 at 108-28). He

20

further noted, "[a]t [Jean P.'s] hearing, she testified that she uses braces on her legs when walking and takes 45 minutes to walk around the block." Filing 17-2 at 17. The record shows that the ALJ considered Jean P.'s use of braces. The ALJ first noted that per Jean P.'s testimony, she was still using braces when walking. Filing 17-2 at 17. In the ALJ's discussion of Jean P.'s tibial plateau fracture, he did not conclude she was no longer using braces, but simply referenced a statement by her treating physician that she may discontinue the use of braces. Filing 17-2 at 18 (citing Filing 18-1).

The ALJ additionally considered Jean P.'s indication that the symptoms from her impairments have caused pain, impeded her ability to do chores without taking breaks, and required her to stop and rest while walking. Filing 17-2 at 17 (citing Filing 17-7). However, the ALJ determined Jean P.'s ability to perform personal care tasks independently, prepare simple meals, shop, drive, and do household tasks, such as vacuuming, dusting, and cleaning the bathroom and kitchen with breaks, was "a strong indication she retains the capacity to perform the requisite physical . . . tasks that are part of everyday basic work activity." Filing 17-2 at 18 (citing Filing 17-7). With regard to Jean P.'s back, the ALJ acknowledged she demonstrated "tenderness, muscle spasm, reduced range of motion, and a positive straight leg raise test." Filing 17-2 at 19 (citing Filing 18-2). The ALJ also found, however, that despite these showings, Jean P. "typically demonstrates a normal gait, full strength, normal range of motion, and normal muscle tone." Filing 17-2 at 19 (citing Filing 18-1; Filing 18-2). There is substantial evidence in the record, which the ALJ relied upon, to support the ALJ's RFC finding, and therefore, the ALJ did not err. See *Teague*, 638 F.3d at 614 (citing *Finch v. Asture*, 547 F.3d 933, 935 (8th Cir. 2008)) ("Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.").

### 3. *Separation of Powers*

Finally, Jean P. contends the structure put in place by the statute applicable to removal of the Commissioner of Social Security violated the separation of powers. Filing 22 at 8–9. The ALJ who adjudicated Jean P.'s claim had his appointment ratified in July 2018 by then-Acting Commissioner Berryhill. Former President Trump nominated Andrew Saul to serve as Commissioner in April 2018; he assumed the office in June 2019, and he served until July 9, 2021. President Biden removed former-Commissioner Saul and appointed Kilolo Kijakazi as Commissioner of Social Security.

Removal of the Commissioner of Social Security is governed by 42 U.S.C. § 902(a)(3). Under the removal statute, the President may only remove the Commissioner from office for "neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3). Jean P. asserts this removal statute is unconstitutional because the Commissioner is a single agency head who serves for a longer term than the President and can only be removed for cause. Filing 22 at 8. Because Commissioner Saul served under an unconstitutional removal statute, Jean P. argues, his delegation of authority to the ALJ and Appeals Council was constitutionally invalid. Filing 22 at 9. Therefore, according to Jean P., the ALJ and Appeals Council lacked the authority to decide her case. Filing 22 at 9; *see* Filing 26 at 8, 10. Jean P. requests the case "be remanded for a *de novo* hearing before a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." Filing 22 at 11.

Both parties agree that the removal provision at issue is unconstitutional. Filing 22 at 9; *see also* Filing 25 at 12 ("The parties agree 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause."); *accord Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197

(2020) ("We hold that the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."). Assuming without deciding that 42 U.S.C. § 902(a)(3) is unconstitutional, the issue before this Court is whether the constitutional infirmity invalidates the ALJ's and Appeals Council's administrative decisions in this case. For the reasons explained herein, this Court finds the removal provision does not deprive the Commissioner of the authority to delegate the power to issue a decision on Jean P.'s claim to the ALJs and Appeals Council and did not result in compensable harm to Jean P. that would require reversal of the ALJ's decision denying benefits.

### 1. *Severability of the Removal Restriction*

According to Jean P., because 42 U.S.C. § 902(a)(3)'s removal provision is unconstitutional, the Commissioner's delegation of authority to the ALJ and Appeals Council is constitutionally defective. Filing 22 at 9. The Commissioner argues that the unconstitutional removal provision is severable from the remainder of the statute, and thus the delegation of authority to the ALJ and Appeals Council is unproblematic. The Court agrees with the Commissioner.

The Supreme Court has found that removal provisions like § 902(a)(3) are severable from their respective statutes. *Seila Law*, 140 S. Ct. at 2209 ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are capable of functioning independently . . . ."); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1788, n.23 (2021) ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .").

In *Seila Law*, the Supreme Court addressed the question of whether the unconstitutional portion of the Dodd-Frank Act, which protected the Consumer Financial Protection Bureau's (CFPB's) director from removal other than for cause, was severable from the rest of the Act. *Seila Law*, 140 S. Ct. at 2207–09. The Supreme Court noted, "It has long been settled that 'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'" *Id.* at 2208 (quoting *Loeb v. Columbia Twp. Trs.*, 179 U.S. 472, 490 (1900)). "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010)). "Even in the absence of a severability clause, the 'traditional' rule is that 'the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'" *Id.* (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987)). The only constitutional defect at issue in the CFPB's structure in *Seila Law* was the Director's insulation from removal, and the Court stated:

> The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are capable of functioning independently, and there is nothing in the text or history of the Dodd-Frank Act that demonstrates Congress would have preferred *no* CFPB to a CFPB supervised by the President.[4]

*Id.* (emphasis original).

Similarly here, assuming the removal clause in 42 U.S.C. § 902(a)(3) is unconstitutional, it does not render the whole act void. Without the presence of § 902(a)(3), the remaining provisions

---

[4] While the Dodd-Frank Act included an express severability clause, the Court stated, " if the surviving provisions were capable of 'functioning independently' and 'nothing in the statute's text or historical context [made] it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will'" then an unconstitutional removal provision is severable "even in the absence of an express severability clause." *Id.* at 2209 (quoting *Free Enter. Fund*, 561 U.S. at 509).

can function independently, and the Social Security Administration (SSA) remains fully functional. *Accord Butcher v. Comm'r of Soc. Sec.*, No. 2:20-CV-6081, 2021 WL 6033683 at *7 (S.D. Ohio Dec. 21, 2021) ("If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional."); *Robinson v. Kijakazi*, No. 21-CV-238-SCD, 2022 WL 443923 at *6 (E.D. Wis. Feb. 14, 2022) ("Because the Social Security Act does not contain an inseverability clause, the SSA would remain fully functional if the removal clause in § 902(a)(3) is erased."). The SSA continues to operate even if the Commissioner's position is unfilled or delegated to an acting Commissioner. *Michele T. v. Comm'r of Soc. Sec.*, No. 3:20-CV-06085-JRC, 2021 WL 5356721 at *4 (W.D. Wash. Nov. 17, 2021). "It would be unrealistic to imagine that the work of the entire Administration suddenly stops whenever the Commissioner is unavailable, or the position is temporarily vacated for any reason. The work must go on." *Id.* at *4. As a result, the Court finds the removal clause in § 902(a)(3) is severable from the remaining provisions in the Social Security Act, and the constitutionality of the removal provision does not impact the ALJ's authority to adjudicate Jean P.'s claim.

### 2. Delegation of Power

The Commissioner argues an additional reason that the ALJ's decision in this case was not constitutionally infirm is because the ALJ who adjudicated Jean P.'s claim was appointed by an *acting* commissioner of social security rather than a confirmed commissioner. Filing 25 at 13-16. The Acting Commissioner, Berryhill, was removable at will, and the Commissioner argues this "severed any conceivable nexus between Section 902(a)(3)'s tenure protection . . . and any alleged harm to Plaintiff." Filing 25 at 15–16. Jean P. asserts the Commissioner's argument is "unresponsive to her claim" as her "challenge is an entirely distinct one which contests not the

adjudicators' appointments, but rather the delegation of authority under which they adjudicated and then decided this case." Filing 26 at 10. The Court agrees with the Commissioner.

In *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021), the Supreme Court applied *Seila Law* and held the removal provision that restricted the President's ability to remove the Director of the Fair Housing Finance Agency (FHFA) only "for cause" was unconstitutional. ("A straight forward application of *Seila Law's* reasoning dictates the result here. The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power."). In addressing the scope of relief, the Court distinguished actions taken under an Acting Director from actions taken under a confirmed Director. *Id.* at 1781. The Housing and Economic Recovery Act of 2008 ("Recovery Act"), which created the FHFA, provided, "The Director shall be appointed for a term of 5 years, unless removed before the end of such term for cause by the President." *Id.* at 1781–82 (citing 12 U.S.C. § 4512(b)(2)). The Court observed, "[12 U.S.C. § 4512(b)(2)] refers only to 'the Director,' and is surrounded by other provisions that apply only to the director." *Id.* at 1782. "The Act's mention of an 'acting Director' does not appear until four subsections later, and that subsection does not include any removal restriction." *Id.* The Court found that omission compelling and stated, "[w]hen a statute does not limit the President's power to remove an agency head, we generally presume that the officer serves at the President's pleasure." *Id.* Further, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)).

It is generally presumed the President has the power to remove any executive officer at will, and "a statute must contain 'plain language to take [that power] away.'" *Id.* at 1783 (quoting

26

*Shurtleff v. United States*, 189 U.S. 311, 316 (1903)). As a result, the Court held "that the Recovery Act's removal restriction does not extend to an Acting Director." *Id.* If the "statute does not restrict the removal of an Acting Director, any harm resulting from actions taken under an Acting Director would not be attributable to a constitutional violation. Only harm caused by a confirmed Director's [actions] . . . could then provide a basis for relief." *Id.* at 1781.

Here, § 902(a)(3) refers only to the Commissioner and is surrounded by provisions that apply only to the Commissioner. *See* 42 U.S.C. § 902(a)(1) (proscribing the method of appointment for the Commissioner); 42 U.S.C. § 902(a)(2) (establishing the Commissioner's compensation rate); 42 U.S.C. § 902(a)(4)-(8) (discussing the duties of the Commissioner). The only mention of an "Acting Commissioner" in 42 U.S.C. § 902 comes in subsection (b)(4), and that subsection does not include any removal restriction. *But see Tafoya v. Kijakazi*, 551 F. Supp. 3d 1054, 1061—62 (D. Colo. 2021) (stating that the language of § 902(a)(3) is broad enough to encompass an Acting Commissioner). § 902(b)(4) merely states "[t]he Deputy Commissioner shall be Acting Commissioner of the Administration during the absence or disability of the Commissioner and, unless the President designates another officer of the Government as Acting Commissioner, in the event of a vacancy in the office of the Commissioner." 42 U.S.C. § 902(b)(4).

Congress explicitly restricted the President's power to remove a confirmed Commissioner. *See* 42 U.S.C. § 902(a)(3) ("An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."). Because the statute does not expressly limit the President's power to remove the Acting Commissioner, it is presumed the President has the power to remove the Acting Commissioner at will. *See Collins*, 141 S. Ct. at 1783 ("[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that

power] away.'"). The statute does not restrict the removal of an Acting Commissioner, therefore, any harm resulting from the ALJ's actions taken under then-Acting Commissioner Berryhill would not be attributable to a constitutional violation and would not provide a basis for relief. *See id.* at 1781 ("[I]f the statute does not restrict the removal of an Acting Director, any harm resulting from actions taken under an Acting Director would not be attributable to a constitutional violation. Only harm caused by a confirmed Director's [actions] . . . could then provide a basis for relief.").

Jean P. argues her assertion is solely a removal-clause challenge and not an appointments-clause challenge and any focus on how the ALJ or Appeals Council was appointed misconstrues her argument. Filing 26 at 10. The Court disagrees. As set forth above, it is necessary for the Court to consider how Acting Commissioner Berryhill assumed office in order to determine the applicability of the removal provision with which Jean P. takes issue.

Additionally, the Court in *Collins* made clear that "the unlawfulness of the removal provision does not strip the [agency head] of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1789 n.23 (citing *Seila Law*, 140 S. Ct. at 2207–11). Even assuming the unconstitutionality of § 902(a)(3)'s removal provision, then-Commissioner Saul was permitted to undertake the responsibilities of his office, including the delegation of power to the ALJ and Appeals Council to decide cases.[5] *See id.* at 1789 n.23. Accordingly, the delegation of power from then-Commissioner Saul to the ALJ and Appeals Council judges who decided Jean P.'s case was not constitutionally defective, and the judges had lawful authority to decide Jean P.'s case. *See id.* at 1789 n.23.

---

[5] 42 U.S.C. § 902(a)(7) gives the Commissioner the authority to "assign duties, and delegate, or authorize successive redelegations of, authority to act and to render decisions, to such officers and employees of the Administration as the Commissioner may find necessary."

### 3. Nexus of Harm

Even if the actions of the ALJ and Appeals Council were constitutionally infirm for the reasons Jean P. argues, the Court would still not reverse their decisions because Jean P. has not demonstrated she suffered any harm as a result of the alleged constitutional defects.

The fact a party has been impacted by a decision of an agency that suffers from an allegedly unconstitutional removal restriction does not mean the actions or decisions of the agency are necessarily void or that the party is entitled to judicial relief. *See Collins*, 141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ."). To create an entitlement to relief, Jean P. must show that the "unconstitutional provision[] inflict[ed] compensable harm." *Id.* at 1788.

Jean P. argues the harm she suffered was not receiving a constitutionally valid hearing, adjudication, or decision from either the ALJ or the Appeals Council. Filing 26 at 8–9. She additionally contends that if a more specific injury is required, President Biden's inability to remove then-Commissioner Saul on the first day of his Presidency is enough to satisfy a stricter causation requirement. Filing 26 at 13. Jean P. contends that had the removal restriction in § 902(a)(3) not existed, President Biden could have removed then-Commissioner Saul on the first day of his Presidency. *See* Filing 26 at 14–15. To support her proposition, Jean P. points to President Biden's removal of Commissioner Saul the day after the Department of Justice (DOJ) confirmed the constitutional infirmity of the removal provision after the decision in *Collins*. Filing 26 at 14. Additionally, Jean P. points to a statement released from the White House regarding then-Commissioner Saul's actions that "undermined and politicized Social Security disability benefits . . . reduced due process protections . . . and r[a]n contrary to the mission of the agency and the President's policy agenda." Filing 26 at 14.

As other courts have noted, "the fact that President Biden removed the Commissioner soon after the DOJ's opinion regarding the applicability of the *Collins* decision to the statute does not necessarily mean President Biden would have removed Commissioner Saul" any sooner than he did. *Kathy R. v. Kijakazi*, No. 2:21-CV-00095-JDL, 2022 WL 42916 at *4 (D. Me. Jan. 5, 2022). Further, the statement Jean P. relies on "was attributed to a 'White House official' and not the President [himself]". *See id.*

Most importantly, however, Jean P. fails to show how President Biden's ability or inability to remove then-Commissioner Saul sooner would have affected the decision of the ALJ or the Appeals Council who decided her case. *See John R. v. Comm'r of Soc. Sec.*, No. C20-6176-MLP, 2021 WL 5356719 at *7 (W.D. Wash. Nov. 16, 2021) (citing *Collins*, 141 S. Ct. at 1802) ("Plaintiff has alleged no direct action by former Commissioner Saul himself, and no involvement—or even awareness—by the former President in the ALJ's decision."). Jean P. has not shown a clear connection between the allegedly unconstitutional limit on then-Commissioner Saul's removal and the ALJ's and Appeals Council's decisions denying her benefits. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) ("[T]here is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."); *see also Collins*, 141 S. Ct. at 1802 (Kagan, J., concurring in part) ("[T]he majority's approach should help protect agency decisions that would never have risen to the President's notice . . . [G]iven the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone."). Jean P., therefore, has not demonstrated the removal provision caused compensable

harm. *See Collins*, 141 S. Ct. at 1788 (Plaintiff must show that the "unconstitutional provision []

inflict[ed] compensable harm.").[6]

Accordingly, the Court concludes the removal procedure applicable to the Commissioner of

the SSA does not necessitate reversal of the ALJ or Appeals Council's decision in Jean P.'s case.[7]

Jean P.'s request that her case "be remanded for a *de novo* hearing before a new ALJ who does not

suffer from the unconstitutional taint of having previously heard and decided this case when the

ALJ had no lawful authority to do so," Filing 22 at 11, is denied.

### III. CONCLUSION

The Court finds the Commissioner's final decision denying Jean P.'s claim for benefits under

the Act should be affirmed. Accordingly,

IT IS ORDERED:

1.  The Commissioner's Motion to Affirm Commissioner's Decision, Filing 24, is

    granted;

2.  Petitioner's Motion for an Order Reversing the Commissioner's Decision, Filing 21,

    is denied;

3.  The Commissioner's final decision is affirmed; and

4.  A separate judgment will be entered.

---

[6] *James D., v. Comm'r of Social Security*, No. C21-5413-MLP, 2022 WL 522994 at *7 (W.D. Wash. Feb. 22, 2022) ("Plaintiff has alleged no direct action by former Commissioner Saul himself, and no involvement—or even awareness—by the former President in the ALJ's decision . . . Nor does Plaintiff's reference to an unnamed White House official's justification for Commissioner Saul's removal indicate that Plaintiff was harmed."); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112 at *2 (N.D. Iowa July 9, 2021) ("Although it is possible claimant could prevail at a new hearing in front of a new ALJ, that success would not have anything to do with whether the Commissioner was removable at will by the President."); *Satterthwaite v. Kijakazi*, No. 3:20-CV-724-MOC, 2022 WL 468946 at *6 (W.D.N.C. Feb. 15, 2022) ("Plaintiff . . . cannot conceivably show how the President's supposed inability to remove the Commissioner without cause might possibly have affected any ALJ's disability benefits decision, much less the decision on Plaintiff's specific claim.").
[7] The Court therefore need not consider the alternative arguments advanced by the Commissioner (i.e., Harmless Error doctrine, De Facto Officer doctrine, Rule of Necessity, and broad prudential concerns) in support of the constitutionality of the ALJ and Appeals Council's decision. Filing 25 at 21-24.

Dated this 12th day of May, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge